# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
In re:                                          :  Chapter 15
                                                :
SPECTRA PREMIUM INDUSTRIES INC., et al.,[1]     :  Case No. 20-10611 (BLS)
                                                :
                                                :  (Jointly Administered)
        Debtors in a Foreign Proceeding.        :
                                                :  Re: D.I. 5, 33, 34 & 44
-------------------------------------------------------------- x
```

## PETITIONER'S RESPONSE IN (A) FURTHER SUPPORT OF VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF THE CANADIAN PROCEEDINGS AND REQUEST FOR RELATED RELIEF, AND (B) OPPOSITION TO OBJECTIONS TO RECOGNITION OF THE CANADIAN PROCEEDINGS

---

[1]   The Debtors in these Chapter 15 cases, along with the last four digits of each Debtor's federal identification number, are:  Spectra Premium Industries Inc. (4016); Spectra Premium Holdings (USA) Corp. (7133); Spectra Premium (USA) Corp. (9447); and Spectra Premium Properties (USA) Corp. (7618).  The registered office of Spectra Premium Industries Inc., the Debtors' ultimate parent company, is located at 1 Place Ville Marie in Montréal, Quebec, Canada, H3B 4M4, Suite 4000.  The Debtors are collectively managed from the Spectra Group's corporate headquarters in Boucherville, Quebec, Canada.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................2

BACKGROUND .............................................................................................4

RECOGNITION OF THE CANADIAN PROCEEDINGS  FOR THREE OF THE FOUR
DEBTORS IS UNCONTESTED...........................................................................5

RESPONSE....................................................................................................5

I.      Spectra US's COMI Lies in Canada .......................................................5

II.     Alternatively, Spectra US has an "Establishment" in Canada ....................12

III.    There is No Basis to Apply Bankruptcy Code Provisions  that Congress
        Intentionally Omitted From Chapter 15.................................................15

        A.      There is No Basis to Replace the CCAA With Provisions of the
                Bankruptcy Code ...............................................................16

        B.      The Objectors' Reliance on *Qimonda* is Misplaced .......................19

        C.      The CCAA Already Protects the Objectors' Interests .....................20

CONCLUSION...............................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aerovias Nacionales de Colombia S.A.*,
    303 B.R. 1 (Bankr. S.D.N.Y. 2003) ...................................................................17

*In re Angiotech Pharm.*,
    Case No. 11-10269 (KG) (Bankr. D. Del. Feb. 22, 2011) .......................................11

*Beveridge v. Vidunas (In re O'Reilly)*,
    598 B.R. 784 (Bankr. W.D. Pa. 2019) ..............................................................13

*In re British Am. Ins. Co.*,
    425 B.R. 884 (Bankr. S.D. Fla. 2010) ............................................................6, 8

*In re Catalyst Paper Corp.*,
    Case No. 12-10221 (PJW) (Bankr. D. Del. Mar. 5, 2012) .......................................10

*In re Chiang*,
    437 B.R. 397 (Bankr. C.D. Cal. 2010) ..............................................................5

*In re Creative Fin. Ltd.*,
    543 B.R. 498 (Bankr. S.D.N.Y. 2016) ..............................................................14

*In re Ephedra Prods. Liab. Litig.*,
    349 B.R. 333 (S.D.N.Y. 2006) .....................................................................17

*In re Fairfield Sentry Ltd.*,
    714 F.3d 127 (2d Cir. 2013) ..................................................................6, 11, 17

*In re Fraser Papers Inc.*,
    Case No. 09-12123 (KJC) (Bankr. D. Del. July 14, 2009) .......................................11

*In re Friedman's Inc.*,
    738 F.3d 547 (3d Cir. 2013) ........................................................................20

*Jaffe v. Samsung Elecs. Co.*,
    737 F.3d 14 (4th Cir. 2013) ........................................................................19

*In re Kraus Carpet Inc.*,
    Case No. 18-12057 (KG) (Bankr. D. Del. Oct. 1, 2018) .........................................10

*Lavie v. Ran (In re Ran)*,
    607 F.3d 1017 (5th Cir. 2010) ......................................................................13

*In re Metcalfe & Mansfield Alternative Invs.*,
  421 B.R. 685 (Bankr. S.D.N.Y. 2010) ........................................................................18

*In re Millennium Global Emerging Credit Master Fund Ltd.*,
  458 B.R. 63 (Bankr. S.D.N.Y. 2011) ....................................................................13, 14

*In re Mood Media Corp.*,
  569 B.R. 556 (Bankr. S.D.N.Y. 2017) .......................................................................13

*In re OAS S.A.*,
  533 B.R. 83 (Bankr. S.D.N.Y. 2015) .........................................................7, 12, 17, 18

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
  446 F. Supp. 2d 205 (S.D.N.Y. 2006) ...........................................................................6

*In re Qimonda AG Bankruptcy Litig.*,
  433 B.R. 547 (E.D. Va. 2010) ............................................................................16, 19

*In re Rabin*,
  361 B.R. 282 (Bankr. S.D. Fla. 2007) .......................................................................17

*In re Rede Energia S.A.*,
  515 B.R. 69 (Bankr. S.D.N.Y. 2014) ....................................................................18, 20

*In re SemCrude, L.P.*,
  399 B.R. 388 (Bankr. D. Del. 2009) .........................................................................20

*In re Serviços de Petróleo de Constellation S.A.*,
  600 B.R. 237 (Bankr. S.D.N.Y. 2019) ........................................7, 11, 12, 13, 14

*In re SPhinX, Ltd.*,
  351 B.R. 103 (Bankr. S.D.N.Y. 2006) ...............................................................5, 6, 12

**Rules and Statutes**

11 U.S.C. § 101 .................................................................................................1, 2

11 U.S.C. § 109 ...................................................................................................17

11 U.S.C. § 365 ...............................................................2, 3, 4, 15, 16, 17, 19, 20, 21

11 U.S.C. § 502 ..............................................................................................21, 22

11 U.S.C. § 1501 .................................................................................................16

11 U.S.C. § 1502 .................................................................................................13

11 U.S.C. § 1506 ..........................................................................................2, 15, 18

11 U.S.C. § 1515 ......................................................................................................2

11 U.S.C. § 1517 ................................................................................................12, 23

11 U.S.C. § 1521 ..................................................................................................3, 15

11 U.S.C. § 1522 ............................................................................................2, 15, 20

**Other Authorities**

H. Rep. No. 109-31 ...................................................................................................13

UNCITRAL Model Law .................................................................................7, 13, 17

Ernst & Young Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Petitioner"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Spectra Premium Industries Inc. ("Spectra"), Spectra Premium Holdings (USA) Corp. ("Spectra Holdings US"), Spectra Premium (USA) Corp. ("Spectra US"), and Spectra Premium Properties (USA) Corp. ("Spectra Properties US" and, together with Spectra, Spectra Holdings US and Spectra US, the "Debtors"), through its United States co-counsels, Landis Rath & Cobb LLP and Norton Rose Fulbright US LLP, hereby files this response (the "Response") (i) in further support of the *Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* [D.I. 5] (the "Verified Petition"),[2] and (ii) in opposition to the objections (the "Objections") of (a) Indiana Becknell Investors 2011 LLC and Alliance Interstate Park Indiana Becknell Investors LLC [D.I. 33] (together, the "Landlords"), (b) Varilease Finance, Inc. [D.I. 34] ("Varilease"), and (c) the partial joinder of Daiko Auto Parts and GLTEK Trading Corporation [D.I. 44] (the "Suppliers" and collectively with the Landlords and Varilease, the "Objectors").  In further support of the Verified Petition and this Response, the Debtors rely on, among other things, the *Supplemental Declaration of Guillaume Pierre Michaud in Further Support of Recognition of the Canadian Proceedings and in Response to Objections to Recognition* (the "Supplemental Michaud Declaration") and the *Declaration of Éric St-Amour in Further Support of Recognition of the Canadian Proceedings and in Response to Objections to Recognition* (the "St-Amour Declaration"), each of which was filed contemporaneously herewith.  The Petitioner respectfully states as follows:

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Verified Petition.

## PRELIMINARY STATEMENT

The Petitioner has sought Chapter 15 recognition of the Canadian Proceedings so that the Canadian Proceedings can be administered efficiently and effectively in Canada under the direct supervision of the Canadian Court. In its "first day" papers, the Petitioner established that each of the Canadian Proceedings should be recognized as a foreign main proceeding or, in the alternative, as a foreign non-main proceeding. Specifically, the Petitioner has demonstrated that:

- each of the Canadian Proceedings is a "foreign proceeding" as defined in section 101(23) of the Bankruptcy Code;

- each Debtor's center of main interests (COMI) is located in Canada, where the Spectra Group's headquarters are located and from where all management decisions for the group are made;

- the Petitioner, as the court-appointed monitor of the Debtors, is a "foreign representative" as defined in section 101(24) of the Bankruptcy Code; and

- the Petitioner has satisfied all of the filing and disclosure requirements set out in section 1515 of the Bankruptcy Code.

With respect to three of the four Debtors, the petitions for recognition are uncontested. However, three creditors have contested the recognition of Spectra US's Canadian Proceeding as a foreign main proceeding. They have not, however, opposed recognition of Spectra US's Canadian Proceeding as a foreign nonmain proceeding.

The Objections to recognition are substantially the same and raise two central issues.[3] First, the Objectors challenge recognition of Spectra US's Canadian Proceeding as a foreign main proceeding based on the allegation that Spectra US's COMI is located in the U.S., not Canada. Second, the Objectors allege that if the Court is inclined to grant recognition to Spectra US's Canadian Proceeding as either a foreign main or foreign nonmain proceeding, then sections 1522 and 1506 of the Bankruptcy Code require that the Court apply section 365 and various

---

[3]    Unless otherwise indicated, any response herein to an argument raised by the Landlords should be construed as applying to the Varilease Objection, and vice versa.

other sections of the Bankruptcy Code in order to "protect the interests" of the Objectors.  For the reasons set forth herein, the Objections should be overruled.

Spectra US's COMI is in Canada and, therefore, its Canadian Proceeding should be recognized as a foreign main proceeding.  As set forth below, the corporate headquarters or "nerve center" of Spectra US, which is a part of the integrated group of companies known as the "Spectra Group," is located in Boucherville, Canada.  This is where Spectra US's management team is located, and the location from which all corporate-management functions for Spectra US are conducted.  This includes, among other things, all banking, finance, human resource, compliance, and tax-related services.  Moreover, Spectra US has an establishment in Canada.  Consequently, in the unlikely event that the Court concludes that Spectra US's COMI is located outside of Canada, this Court should grant recognition to Spectra US's Canadian Proceeding as a foreign nonmain proceeding, and grant the relief requested under section 1521 of the Bankruptcy Code.

The Objectors' second argument—that the Court should impose section 365 and other sections of the Bankruptcy Code that Congress intentionally omitted from Chapter 15 in this ancillary case—is unprecedented, is legally unsupportable, is inconsistent with the express purposes and goals of Chapter 15, and ignores the protections granted to creditors and other parties in interest under the CCAA.  The Objectors allege that the CCAA should not apply to their contracts because the Objectors and Spectra US are U.S. entities and the underlying leases and contracts are governed by U.S. law.  However, these facts have absolutely no bearing on whether the CCAA applies to the Objectors' contracts.  Just like the provisions of the Bankruptcy Code (section 365 in particular) apply to any company that is eligible to be a debtor under Chapter 11, regardless of debtor's country of origin, the CCAA (section 32 in particular)

governs a Canadian debtor's rights with respect to its contracts and leases.  And these rights exist regardless of the law governing the contract and regardless of the country of origin of the debtor and contract-counterparty.

Moreover, although the Objectors argue that public policy considerations support granting them additional protections, the Objectors have it backwards.  There is no U.S. policy that warrants replacing the provisions of the CCAA with those of the U.S. Bankruptcy Code with respect to the treatment of Spectra US's contracts.  This is particularly true given that Congress intentionally omitted section 365 of the Bankruptcy Code from Chapter 15.  Instead, , there are strong U.S. policy reasons that support the Petitioner's request.  First,  U.S. public policy favors granting comity and recognizing foreign proceedings, especially ones pending in a sister common law jurisdiction.  Indeed, one of the express objectives of Chapter 15 is for U.S. courts to assist foreign courts in administering foreign insolvency cases.  Replacing the CCAA, which governs the Canadian Proceedings, with provisions of the Bankruptcy Code would be the antithesis of the assistance envisioned by Chapter 15.  Second, U.S. public policy generally mandates that similarly situated creditors be treated the same in a bankruptcy case.  If this Court were to grant the Objectors' request, then the Court would be elevating the rights of the Objectors over all of the Debtors' other creditors, including the dozens of contract and lease counterparties that are subject to, and in compliance with, the CCAA.  The Court should reject the Objectors' request, and instead grant recognition to the Canadian Proceedings so that they can be administered efficiently and effectively in Canada, consistent with the provisions of the CCAA for the benefit of all stakeholders.

## **BACKGROUND**

1.     The Court is respectfully referred to the Verified Petition, which contains the relevant facts, all of which are incorporated herein by reference.

## RECOGNITION OF THE CANADIAN PROCEEDINGS
## <u>FOR THREE OF THE FOUR DEBTORS IS UNCONTESTED</u>

2.      The petitions seeking recognition of the Canadian Proceedings for all of the Debtors, except Spectra US, are uncontested and should be granted for the reasons set forth in the Verified Petition and the other pleadings filed in support thereof.

3.      With respect to Spectra US, the Objectors have only challenged recognition of the Canadian Proceeding as a foreign main proceeding; they have not challenged recognition of Spectra US's Canadian Proceeding as a foreign nonmain proceeding.   Nevertheless, Spectra US's Canadian Proceeding should be recognized as a foreign main proceeding because, as set forth below, the Objections are without merit.

## <u>RESPONSE</u>

### I.      Spectra US's COMI Lies in Canada

4.      The evidence plainly demonstrates that each of the Debtors—including Spectra US—has its COMI in Canada.[4]  The Objectors have ***not*** challenged that the COMI of Spectra, Spectra Holdings US, or Spectra Proprieties US lies in Canada.  They have objected ***only*** to the recognition of Spectra US's Canadian Proceeding as a foreign main proceeding on the limited basis that its COMI is in the U.S., not Canada.[5]  *See, e.g*., Landlords Objection at ¶ 18.  The Objections, however, are not supported by the facts or the law that guides the Court's COMI analysis.

5.      The Objections refer to certain factors formulated in *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) that courts routinely consider in determining a debtor's COMI,

---

[4]    When performing a COMI analysis, the court need not identify a particular place within a jurisdiction, *e.g.*, a given identified office or corporate headquarters, but only the jurisdiction generally in which the debtor's business interests are principally centered.  *See In re Chiang*, 437 B.R. 397, 399 n.3 (Bankr. C.D. Cal. 2010).

[5]    None of the Objectors has asserted that the other statutory predicates and requirements for recognition have not been satisfied.

which are "[i] the location of the debtor's headquarters; [ii] the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); [iii] the location of the debtor's primary assets; [iv] the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or [v] the jurisdiction whose law would apply to most disputes." *Id.*; *see e.g.*, Landlords Objection at ¶ 21. The Objectors offer argument—not evidence—that, based on a mathematical tally of the *SPhinX* factors, Spectra US's COMI is in the U.S. because its primary assets and most of its creditors are located here and because U.S. law would purportedly apply to most of Spectra US's disputes. That analysis oversimplifies and ignores the substantial weight of the evidence, and, contrary to law, advances a rigid, inflexible approach to determining COMI . The *SPhinX* factors are not a legal litmus test for Chapter 15 recognition to be mechanically applied in every case. *See SPhinX*, 351 B.R. at 117; *In re Fairfield Sentry Ltd.,* 714 F.3d 127, 137 (2d Cir. 2013) (warning against a mechanical application of the factors).

6.      Courts have recognized that the COMI analysis is flexible, noting that Congress, in declining to provide a definition "for a term that is not self-defining," left the text "open-ended, and invite[d] development by courts, depending on [the] facts presented, without prescription or limitation." *Fairfield Sentry*, 714 F.3d at 138. Courts examine a debtor's COMI focusing not on a checklist of factors, but on the substance and practical realities of a debtor's business and operations. *See, e.g., In re British Am. Ins. Co.*, 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010). A COMI analysis probes the debtor's substantive "locus of operations," *i.e.*, the center of its operations, its purpose, its function, and its activities. *See Phoenix Four, Inc. v. Strategic Res. Corp.*, 446 F. Supp. 2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted). And where an entity is integrated with and exists only as a part of a larger

corporate group, courts focus the COMI analysis on those particular considerations most indicative of that entity's "real seat." *See Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007). Courts also consider, among other things, "foreign case law interpreting identical provisions of the Model Law," third-party and creditor expectations, the location of a debtor's "principal place of business" or "nerve center," and other considerations. *See In re Serviços de Petróleo de Constellation S.A.*, 600 B.R. 237, 272-76 (Bankr. S.D.N.Y. 2019). Consequently, a debtor's COMI is fact-intensive and evaluated on a case-by-case basis.

7.      Here, under any conceivable test, there is ample evidence demonstrating that the Spectra Group's COMI lies in Canada. The Spectra Group, including Spectra US, is a thoroughly integrated group of companies with its corporate "nerve center" and main business fixed in Canada, as it always has been. The Objectors now ask the Court to ignore all context and treat Spectra US as a separate enterprise, independent of its actual business and role in the Spectra Group. Where an entity is integrated within a larger group, courts often begin by looking at that entity's purpose within the group. *See In re OAS S.A.*, 533 B.R. 83, 101 (Bankr. S.D.N.Y. 2015) (observing that an Austrian entity "had no other business except to pay [the notes] off," and adding that "the Brazilian Bankruptcy Proceedings provide the only realistic chance to repay [those] [n]otes"). For COMI purposes, entities may be considered to be integrated (a) where they exist only in reference to a larger corporate group with integrated operations, customers, corporate teams, marketing, research, development, strategy, human resource management, and administrative activities; and/or (b) where the group is financially integrated and interdependent. *See Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 226-27 (Bankr. S.D.N.Y. 2017) (stating that a Dutch entity's COMI lay in Brazil where it had "no

operations or business independent of the Oi Group and [were] operated within the Oi Group as part of a single, integrated economic unit . . . . managed from the principal executive office of Oi in Rio de Janeiro, Brazil with every aspect of the Oi Group's operations, finances, corporate management, employee management and payroll, and short and long-term strategic planning directed from Brazil").

8.      Here, the Petitioner has demonstrated that each of the Debtors—including Spectra US—is managed from the Spectra Group's corporate headquarters in Boucherville and installations in the Montréal region.  *See* Verified Petition ¶ 19; *see also British Am. Ins.*, 425 B.R. at 911 ("The headquarters of a corporate entity is more than the location of its board of directors.  The term headquarters, or head office, contemplates the place where the primary management of an entity's business is undertaken. Management of a corporate entity includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions. Other functions may be relevant depending on the nature of the debtor's business.").  The Objectors disregard the realities of Spectra US's management and place within the Spectra Group, and in doing so, attempt to obscure a simple, but critical, fact: Spectra US is not a standalone business.  Functionally, Spectra US is a bundle of US employees, assets, and contracts needed to carry out the business of the larger Spectra Group.  Spectra US's operations are limited to selling and facilitating the distribution of products manufactured by Spectra in Canada or other products manufactured by vendors based in China. Spectra US does ***not*** manufacture its own products, *see* Verified Petition ¶¶ 12, 16, 18; St-Amour Decl. ¶¶ 4-5, and, therefore, has no meaningful business independent of the Spectra Group. Although Spectra US necessarily has U.S. assets, U.S. employees, and U.S. creditors, the

evidence makes plain that Spectra US is inextricably linked to, and reliant upon, the larger

Spectra Group and its collective "nerve center" in Canada.  For example:

- ***Spectra US is Managed From Canada.***  Spectra US's overall short and long-term strategic operations are planned and managed on a consolidated basis by a management team located at Spectra's headquarters in Boucherville and at installations in the Montréal region.  Spectra US's officers and directors are: Jacques Mombleau and Henri-Paul Boyer (the latter, I have been informed, replaced Jason Best in April 2020), both of whom are Canadian residents located in the Montreal region.  Spectra US's board of directors meet in person and, typically, in Canada.  All decisions regarding, among other things, finances, human resources, distribution and sales, product engineering and approval, supply-chain management, and marketing are determined by managers at the Boucherville headquarters and implemented by employees based in both Canada and the United States.

- ***Spectra US's Corporate "Nerve Center" is in Canada***.  All of Spectra US's other "nerve center" functions—including billing, financial services, banking, accounting and taxes, marketing, information technology, human-resource management, legal functions, and other administrative services—are primarily performed or managed by employees located in the Spectra Group's Boucherville headquarters and installations in the Montréal region.

  Although most of Spectra US's employees are located within the United States and work in distribution at the US Distribution Facilities (including local teams to carry out sales and human-resource tasks), a number of its employees that live and work in Canada from the Boucherville headquarters and/or other installations in the Montréal region perform critical tasks for or on behalf of Spectra US.[6]  In addition to the board of directors, the head of the US sales team is located at the Boucherville headquarters.  These Canadian employees, in conjunction with Spectra US's Canadian officers and directors, largely manage and oversee the workforce in the United States and the operation of the US Distribution Facilities.

- ***Spectra US's Key Suppliers are Based in Canada and China, not the United States***.  Spectra US is merely a U.S. distribution channel for the Spectra Group; Spectra US does not manufacture ***any*** goods.  Spectra US distributes products manufactured by Spectra in Canada and other suppliers located in China.  Indeed, China based suppliers constitute the largest portion of Spectra US's unsecured creditor body.[7] Relationships with China based suppliers are managed by employees located in the Boucherville headquarters.

---

[6]    To be clear, for payroll purposes, such employees are designated as Spectra employees; however, their primary responsibilities relate to the operation or other aspects of Spectra US.

[7]    Notably, none of Spectra US's China based creditors has filed an objection to the relief sought in the Verified Petition.

- ***Spectra US is Financially Dependent on the Spectra Group and Canadian Credit Facilities.*** Spectra US relies on financing available through the Spectra Group's Canada-based cash management system and Canadian credit facilities provided by Spectra US's largest secured creditors—Wells Fargo Capital Finance Corporation Canada ("<u>Wells Fargo</u>"), personally and as agent to Canadian Imperial Bank of Commerce ("<u>CIBC</u>") for the Revolving Operating Loan, and Laurentian Bank of Canada ("<u>BLC</u>"), personally and as agent to Export Development Canada ("<u>EDC</u>") for a Term Loan—to pay creditors and otherwise fund operations.

  ***All of Spectra US's assets are pledged to Canadian creditors, which, collectively, are Spectra US's largest economic stakeholders holding more than CAD$100,000,000 of secured indebtedness.*** Each of the Revolving Credit Agreement and the BLC Secured Term Loan Credit Agreement is governed by Canadian law.

  Moreover, the Debtors, including Spectra US, have entered into agreements with both Wells Fargo and BLC with respect to their respective support of the Canadian Proceedings and the present proceedings. The agreement entitled *Forbearance Agreement* entered into on March 9, 2020 between the Debtors, Wells Fargo and CIBC provides that it is governed by the laws of the Province of Québec (Canada). The agreement entitled *Support Agreement* entered into on March 23, 2020 between the Debtors, BLC, and EDC is also specifically governed by the laws of the Province of Québec (Canada).

  In addition, all of Spectra US's bank accounts are managed directly from Canada with the Canadian branch of Wells Fargo.

*See* St-Amour Decl. ¶ 4 (emphasis added); *see also* Verified Petition ¶¶ 11-31. Spectra US is indisputably integrated with, and inseparable from, the Spectra Group. The Spectra Group is managed in Canada. Therefore, Spectra US's COMI is Canada, not the U.S., and its Canadian Proceeding should be recognized as a foreign main proceeding. *See, e.g., In re Kraus Carpet Inc.*, Case No. 18-12057 (KG) (Bankr. D. Del. Oct. 1, 2018) (recognizing Canadian proceeding as foreign main proceeding with respect to one U.S. debtor and five Canadian debtors); *In re Catalyst Paper Corp.*, Case No. 12-10221 (PJW) (Bankr. D. Del. Mar. 5, 2012) (recognizing Canadian proceeding as foreign main proceeding with respect to eight U.S. debtors and nine Canadian debtors); *In re Angiotech Pharm.*, Case No. 11-10269 (KG) (Bankr. D. Del. Feb. 22, 2011) (recognizing Canadian proceeding as foreign main proceeding with respect to 14 U.S.

debtors and three Canadian debtors); *In re Fraser Papers Inc.*, Case No. 09-12123 (KJC) (Bankr. D. Del. July 14, 2009) (recognizing Canadian proceeding as foreign main proceeding with respect to two Canadian debtors and four U.S. debtors).

9.     In addition, third-parties' and creditors' reasonable expectations may also be considered in a COMI analysis. "Creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *Oi Brasil*, 578 B.R. at 228. In this case, the Objectors cannot seriously assert that they did not know that Spectra US was, in reality, a Canadian company. Although the Spectra Group sometimes uses local entities as vehicles for its various business segments, Spectra is a large, established company that has only ever held itself out to be a Canadian company; Spectra US does ***not*** have a public identity independent of Spectra. *See* St-Amour Decl. ¶ 5. The Objectors reasonably should have known that Spectra US's COMI is in Canada.[8] *See Constellation*, 600 B.R. at 275 ("courts have examined as an additional relevant factor whether there exists any objective evidence that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the place of its registered office. . . . by examining factors 'in the public domain,' courts are readily able to determine whether a debtor's COMI is in fact 'regular and ascertainable and not easily subject to tactical removal.'") (quoting *Fairfield Sentry*, 714 F.3d at 130, 136-37) (internal citations omitted); *see also OAS*, 533 B.R. at 103 (noting that purchasers of the notes issued by an Austrian entity "expected to receive repayment from the cash generated by the operations of the [corporate group], and in the event of a default, might ultimately have to enforce their rights in a Brazilian

---

[8]   Indeed, even a cursory investigation into Spectra US would reveal to any third-party or creditor that "Spectra Premium Industries Inc. is a privately held company headquartered in Boucherville, Québec, Canada" with its "head office" in Canada. *See* Company and Contact, Spectra Premium Website (available at https://www.spectrapremium.com/en/company and https://www.spectrapremium.com/en/contact) (last visited May 3, 2020).

bankruptcy proceeding").   Moreover, Spectra US's secured creditors and, by far, its largest economic stakeholders—Wells Fargo and BLC—support the Spectra Group's efforts to effect an operational restructuring in the Canadian Proceedings and obtain recognition of those proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.  *See* Verified Petition ¶ 4; St-Amour Decl. ¶ 5.  As the *SPhinX* Court explained, "because their money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI . . . [as] they can . . . best determine how to maximize the efficiency . . . of a reorganization and ultimately, the value of the debtor.'"  *Constellation*, 600 B.R. at 284.  Spectra US's secured lenders, together, have the largest claims against Spectra US and the most at stake in these proceedings; their support militates in favor of finding that Spectra US's COMI lies in Canada.  *See id.* at 285.

10.     Accordingly, based on the "spectrum of factors" that the Court could consider in determining where Spectra US's COMI lies, the Petitioner respectfully submits that Spectra US's COMI can only lie in Canada.  Thus, the Canadian Proceedings are "foreign main proceedings" with respect to each Debtor under section 1517(b)(1) of the Bankruptcy Code.

**II.     Alternatively, Spectra US has an "Establishment" in Canada**

11.     None of the Objectors has objected to the Petitioner's alternative request to recognize the Canadian Proceedings as "foreign nonmain proceedings."  Although the Petitioner maintains that the record already established in these Chapter 15 cases demonstrates that Spectra US's COMI is in Canada, there is no doubt that Spectra US has an "establishment" in Canada.  Therefore, should this Court not recognize Spectra US's Canadian Proceeding as a foreign main proceeding, this Court should then recognize the proceeding as a foreign nonmain proceeding.

12.     "To be recognized as a nonmain proceeding, the foreign debtor must establish a degree of stable connections with the jurisdiction to constitute a nontransitory 'establishment.'"

*Constellation*, 600 B.R. at 277. Section 1502(2) of the Bankruptcy Code broadly defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). Chapter 15 does not, however, define "nontransitory economic activity," and case law provides little guidance for determining what constitutes an establishment. *See In re Millennium Global Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 84 (Bankr. S.D.N.Y. 2011) ("[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15."); *see also Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) ("[n]either Chapter 15 nor its legislative history explain what it means for a debtor to have 'any place of operations' or to have 'been carrying on a nontransitory economic activity' in a location.") (citing H. Rep. No. 109-31, Pt. 1, at 107). U.S. courts have determined that, consistent with the purpose of Chapter 15 and the Model Law, a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise carries out a nontransitory economic activity in that jurisdiction. *See, e.g., See Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 806 (Bankr. W.D. Pa. 2019); *In re Mood Media Corp.*, 569 B.R. 556, 561–63 (Bankr. S.D.N.Y. 2017). "The 'establishment' requirement for 'nonmain' status requires, as a prerequisite for any relief under Chapter 15, a ***base level of connection*** between the foreign debtor and the foreign jurisdiction that prevents a debtor from commencing a case in a jurisdiction where it has nothing more than a mail-drop presence." *See Constellation*, 600 B.R. at 277 (quoting William H. Schrag, William C. Heuer, and Robert E. Cortes, *Cross-Border Insolvencies and Chapter 15: Recent U.S. Case Law Determining Whether a Foreign Proceeding Is "Main" or "Nonmain" or Neither*, 17 J. BANKR. L. & PRAC. 5 Art. 4 (Aug. 2008)) (emphasis added). Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of

organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Global*, 458 B.R. at 85.  A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016), evidenced by, among other things, "fees paid to retain local counsel and commitment of capital to local banks." *Millennium Global*, 458 B.R. at 85.

13.     As described above and in the Verified Petition, each of the Debtors, including Spectra US, has an "establishment" in Canada.  For good reason, no Objector has challenged that Spectra US has substantial business ties to, and activities in, Canada.  Canada is not only Spectra US's "nerve center," it is the location of substantially all of its core corporate functions (*e.g.*, human resources, accounting, and other back-office services), its sole source of financing (*i.e.*, the Revolving Credit Agreement), and certain of its creditor-facing personnel.  *See* Verified Petition ¶¶ 15-19; St-Amour Decl. ¶¶ 4-5.  As described above, notwithstanding that Spectra US's assets and certain of its creditors are in the U.S., its real seat is in Canada.  Given the scope of Spectra US's and the other Debtors' extensive business connections to Canada, the Petitioner respectfully submits that, to the extent that any of the Canadian Proceedings is not recognized as a foreign main proceeding, such proceeding should, in the alternative, be recognized as a "foreign nonmain proceeding." *See Constellation*, 600 B.R. at 281-82 (finding that, even though a parent company's COMI lay in Luxembourg, the substantial ongoing business connections of its subsidiaries in Brazil created sufficient "non-transitory ties to Brazil . . . to recognize the Brazilian Proceeding as a foreign nonmain proceeding").

14.     The Petitioner further submits that, if any of the Canadian Proceedings is recognized as a foreign nonmain proceeding, discretionary relief should be granted under section

1521 of the Bankruptcy Code; specifically, the extension of the relief granted in the provisional

relief order [D.I. 25] (the "<u>Provisional Relief Order</u>"), including the application of the automatic

stay to the full extent set forth in section 362 with respect to any such Debtor and its property

located in the U.S.[9]  As discussed below, the Petitioner believes that the Objectors' machinations

in these Chapter 15 cases underscore the need for such relief given Spectra US's important role

within the Spectra Group and the critical need to preserve the Debtors' estates in the Canadian

Proceedings.

### III.    There is No Basis to Apply Bankruptcy Code Provisions that Congress Intentionally Omitted From Chapter 15

15.    The Objectors' second argument is that, if the Court is inclined to grant

recognition to Spectra US's Canadian Proceeding as either a foreign main or foreign nonmain

proceeding, then sections 1522[10] and 1506[11] of the Bankruptcy Code require that the Court apply

section 365 and certain other sections of the Bankruptcy Code in order to "protect the interests"

of the Objectors.  *See, e.g.*, Landlords Objection at ¶ 25.  The relief requested by the Objectors is

unprecedented[12] and undermines the policies and purpose behind Chapter 15, which is to provide

---

[9]    Section 1521(a) provides that, upon recognition of a foreign main proceeding or foreign nonmain proceeding and at the request of the foreign representative, a court may grant "any appropriate relief" necessary to effectuate the purpose of Chapter 15 and to protect the assets of the debtor or the interest of the creditors, including "extending relief granted under section 1519(a)."

[10]    Section 1522, entitled "Protection of creditors and other interested persons," provides that "[t]he court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522.  Notably, section 1522 does not apply to relief granted under section 1520 with respect to recognition of a foreign proceeding as a foreign main proceeding.

[11]    Section 1506 of the Bankruptcy Code, entitled "Public policy exception," provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

[12]    Other than section 365(n), which deals specifically with licenses of intellectual property and was applied in the Chapter 15 case of *Qimonda*, no court has ever applied section 365 in a Chapter 15 case at the request of any party other than a foreign representative.

assistance to foreign courts and foreign debtors so that foreign insolvency cases can be administered efficiently and fairly.  11 U.S.C. § 1501(c).

A.      There is No Basis to Replace the CCAA With Provisions of the Bankruptcy Code

16.      The Objectors' argument is premised on the theory that the CCAA should not apply to the Objectors' contracts[13] because Spectra US is an American company and the contracts and leases at issue are governed by U.S. law.  *See e.g.*, Landlords Objection at ¶¶26 ("[W]here both the Landlords and Spectra USA are United States entities, where the two leases were executed in the United States, where the two leases relate to real property in the United States, and where both leases are governed by United States law, there is no basis to subject these leases to treatment under Canadian law.") and 30 (same).

17.      This argument is legally unsupportable.  As a debtor in the Canadian Proceedings, Spectra US's rights are governed by the CCAA.  *See* Supplemental Michaud Decl. at ¶5.  Section 32 of the CCAA expressly authorizes a debtor in a proceeding under the CCAA to disclaim any contract or lease to which it is a party.  Section 32 of the CCAA applies to ***any company*** that is a debtor under the CCAA.  *See* Supplemental Michaud Decl. at ¶8.  Importantly, there is no requirement that the debtor be a Canadian company or that the contract sought to be disclaimed be governed by Canadian law.  *Id*.  In this regard, section 32 of the CCAA is substantially similar to section 365 of the Bankruptcy Code .  In a Chapter 11 case, a debtor that meets the eligibility requirements of section 109 of the Bankruptcy Code may generally assume or reject an executory contract or lease.  *See* 11 U.S.C. § 365.  It is common for non-U.S. companies to file

---

[13]   Notably, Spectra US filed separate notices seeking to disclaim (i) its lease with the Landlords pursuant to which Spectra US leases a 250,000 square feet warehouse located at 3052 North Distribution Way in Greenfield, Indiana (the "Warehouse Lease"), and (ii) a Master Lease Agreement between Varilease and Spectra US (the "Equipment Lease").  Serious questions exist as to whether the Equipment Lease is a "true lease" or a "disguised financing."  The Petitioner and the Debtors reserve all of their rights with respect to Varilease and the Equipment Lease, including, without limitation, the right to seek recharacterization of the alleged lease.

for relief under Chapter 11, and section 365 of the Bankruptcy Code applies regardless of whether the debtor is a U.S. company or the contract is governed by U.S. law. *See, e.g., In re Rabin*, 361 B.R. 282, 284 (Bankr. S.D. Fla. 2007) ("§ 365 applies to all executory contracts except those specifically excluded from its reach."); *In re Aerovias Nacionales de Colombia S.A.*, 303 B.R. 1, 10 (Bankr. S.D.N.Y. 2003) (noting that Colombian airline could reject leases in a Chapter 11 case).

18.    The Objectors, without citing any case law or other legal support, argue that the purported differences between U.S. and Canadian law provides a basis to incorporate otherwise non-applicable provisions of the Bankruptcy Code into the Chapter 15 cases. *See e.g.*, Landlords Objection ¶¶ 31-33.   The Objectors are mistaken.

19.    U.S. courts have consistently held that differences in substantive law between the U.S. and a foreign country do not implicate section 1506's public policy exception, which should be "narrowly construed" and should be invoked only under "exceptional circumstances concerning matters of fundamental importance." *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y. 2006)*; see also Fairfield Sentry,* 714 F.3d at 139   (referencing the UNCITRAL Model Law and noting that the word "manifestly" in international usage restricts the public policy exception to the most fundamental policies of the United States); *OAS,* 533 B.R. at 105 (finding that "[a]lthough Brazilian law may impose different requirements for substantive consolidation, the different standards, standing alone, do not signify that Brazilian Bankruptcy law is manifestly contrary to our own public policy.").

20.    U.S. creditors are protected in a foreign proceeding so long as their due process rights are respected; *i.e.*, that they have notice and an opportunity to be heard in the foreign proceeding.  For example, in *In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014), a

group of noteholders objected to a Brazilian debtor's attempt to enforce a Brazilian plan in the U.S. because the plan effectuated substantive consolidation of multiple debtors and also provided different recoveries for similarly situated creditors, an outcome which the noteholder alleged was inconsistent with how the creditors would have been treated under Chapter 11 of the U.S. Bankruptcy Code.  Notwithstanding the differences between U.S. and Brazilian law, the bankruptcy court rejected the objection raised by the noteholders and enforced the Brazilian plan in the U.S.  The bankruptcy court reasoned that Chapter 15 does not require that the laws of Brazil be identical to the laws of the U.S.  Instead, section 1506 focuses on process and whether creditors are given full access to information and a fair opportunity to be heard in the foreign proceeding.  *Id.* at 100; *see also OAS,* 533 B.R. at 105 (rejecting section 1506 argument because objector's due process rights in Brazil were preserved as objector had a right to appear and be heard in Brazil to challenge substantive consolidation of debtors).

21.    It is well established that Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process.  *See, e.g., In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010) (finding that Canada is a sister common law jurisdiction with procedures akin to our own, and thus there is no need to be concerned over the adequacy of the procedural safeguards of Canadian proceedings).

22.    Here, all of the Objectors received notice of the Canadian Proceedings and any of them could have challenged the petitions, including Spectra US's eligibility to be a debtor in the Canadian Proceedings.  None chose to do so.  Further, section 32(2) of the CCAA gives the Objectors the right to oppose Spectra US's disclaimer of any lease by filing an application with the Canadian Court.  *See* Supplemental Michaud Decl. at ¶¶ 7, 10.  Notably, Varilease availed

itself of this protection and has filed an application with the Canadian Court, thus protecting its interests.[14]  The Landlords have not.  That the Landlords chose to sit on their rights does not provide a basis to grant them additional protections under section 1522, section 1506 or any other section of the Bankruptcy Code.

       B.      The Objectors' Reliance on *Qimonda* is Misplaced

23.     The Objectors rely on the district court's decision in *Qimonda* to support their position.  *See, e.g.*, Landlords Objection at ¶ 26 (citing *In re Qimonda AG Bankruptcy Litig.*, 433 B.R. 547, 560 (E.D. Va. 2010)).  *Qimonda* is the only case cited by the Objectors and is the only case that the Petitioner is aware of where a U.S. bankruptcy court applied any provision of section 365 over the objection of the foreign representative.  However, *Qimonda* is clearly distinguishable and has no relevance here.  In *Qimonda*, the court held that the protections afforded to nondebtor intellectual property licensees under section 365(n) of the Bankruptcy Code should be available in the Chapter 15 proceeding of Qimonda AG, a German company.  On appeal, the United States Court of Appeals for the Fourth Circuit upheld the lower court decision based on the important public policy underlying section 365(n)—to avoid imposing a burden on American technological development by depriving licensees of their rights in a licensor's bankruptcy.  *Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14 (4th Cir. 2013).

24.     Unlike *Qimonda*, where legitimate and important U.S. policies were implicated, here the Objectors seek to have this Court apply sections of the Bankruptcy Code that Congress intentionally omitted from Chapter 15 for the sole purpose of elevating the Objectors' rights above those of the Debtors' other creditors, including dozens of lessors and other contractual counterparties located in Canada and elsewhere.  The Objectors' attempt to gain favored

---

[14]   On May 7, 2020 Varilease filed an application with the Canadian Court challenging Spectra US's right to disclaim the Equipment Lease.

treatment is precisely the kind of action that Chapter 15 is designed to prevent. Ironically, this result would be inconsistent with section 1522 of the Bankruptcy Code, the section relied on by the Objectors, which is intended to ensure that ***all parties-in-interest***, including the debtor and all other creditors, are protected. *See* 11 U.S.C. § 1522.

25.     In short, the Objectors' policy argument is completely backwards. There is no compelling public policy reason to grant the Objectors substantive rights under the Bankruptcy Code that Congress intentionally omitted from Chapter 15. *See Rede,* 515 B.R. at 100 (finding that it would be inappropriate for a U.S. court to superimpose U.S. law on a case in Brazil as it would be inefficient and would give creditors an unwarranted "second bite at the apple" by transforming the U.S. court into a foreign appellate court.) However, it is well-established that similarly situated creditors should be treated the same in bankruptcy cases. *In re SemCrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009); *In re Friedman's Inc.*, 738 F.3d 547, 561 (3d Cir. 2013). If this Court were to grant the Objectors' request, then the Court would be elevating the rights of the Objectors over the Debtors' other creditors, all of whom are subject to, and complying with, the CCAA. This result would be inconsistent with the objective of cross-border cooperation embodied in Chapter 15.

C.     The CCAA Already Protects the Objectors' Interests

26.     In addition to undermining the key cross-border objectives of cooperation and assistance embedded in Chapter 15, displacing the CCAA in favor of section 365 and other sections of the Bankruptcy Code in the Canadian Proceedings is unnecessary, because the CCAA

already protects non-debtor counterparties and is similar to the U.S. Bankruptcy Code in many respects.[15]

27.    Section 365(a) of the Bankruptcy Code and section 32 of the CCAA are similar in that both statutes permit a debtor to, respectively, "reject" or "disclaim" a contract or lease, subject to court approval and after providing the non-debtor party with notice and an opportunity to be heard.  *See* Supplemental Michaud Decl. at ¶ 18.  The Bankruptcy Code and the CCAA also permit a non-debtor party to a rejected or disclaimed contract to assert a claim based on such rejection or disclaimer.  *See* Supplemental Michaud Decl. at ¶ 19.  Sections 365(g) of the Bankruptcy Code treats rejection of a contract as a prepetition breach, giving rise to a claim under section 502(b) of the Bankruptcy Code.  Creditors have similar rights under the CCAA. Section 32(7) of the CCAA , entitled "Loss related to disclaimer or resiliation," provides that "[i]f an agreement is disclaimed or resiliated, a party to the agreement who suffers a loss in relation to the disclaimer or resiliation is considered to have a provable claim."  *See id*. Accordingly, the Landlords and other Objectors are sufficiently protected under the CCAA as they will be able to assert claims in the Canadian Proceedings if and when their respective agreements are disclaimed.

28.    Finally, the only specific example the Objectors give showing a purported discrepancy in Canadian and U.S. law is a fiction that incorrectly articulates Canadian law.  The Objectors, again without any case law or other legal support, allege that the Canadian Court will look to common law and/or non-insolvency law—specifically the Commercial Tenancies Act,

---

[15]    Oddly, the Objectors have requested the application of many provisions of the Bankruptcy Code in these Chapter 15 cases that simply should not apply given Spectra US's intention to terminate the Warehouse Lease and Equipment Lease.  *See, e.g*., Landlords Objection at ¶ 27.  Specifically, sections 365(b) (requirements for lease assumption), 365(d)(4) (circumstances giving rise to automatic lease rejection) and 365(f) (addressing the assignment of assumed contracts/leases) of the Bankruptcy Code are not relevant given that Spectra US has already sought to disclaim the Warehouse Lease and Equipment Lease.

R.S.O. 1990, c. L.7 (the "CTA")—to limit any claim that the Landlords may have resulting from the disclaimer of the Warehouse Lease. *See, e.g.*, Landlords Objection at ¶¶ 31-32. This argument is a non-starter as the CTA has no relevance to the Canadian Proceedings. The CTA is a local law that applies in the province of Ontario. *See* Supplemental Michaud Decl. at ¶ 20. The law has no application to the Canadian Proceedings, which is pending in Quebec. *Id.* Even if the CTA did apply, it would not limit a landlord's claim in a CCAA proceeding.[16]

29. Significantly, even if the Landlords' claim was limited or capped under the CCAA, this result would not be manifestly contrary to public policy in the U.S. or require added protections in favor of the Landlords. In fact, such a result would be entirely consistent with U.S. bankruptcy law, as section 502(b)(6) of the Bankruptcy Code caps the amount of a lessor's lease rejection damage claim. 11 U.S.C. § 502(b)(6).

30. In short, the Objectors have not demonstrated any harm or prejudice that they would suffer that would justify displacing the CCAA with provisions of the Bankruptcy Code. The Objectors' request is wholly improper and completely unnecessary. The Court should decline to give the Objectors rights under the Bankruptcy Code that would elevate their status above the Debtors' other creditors and would undermine the Debtors' efforts to reorganize in the Canadian Proceedings.

---

[16] Some Canadian courts have distinguished between CCAA proceedings commenced for the purpose of reorganization and those commenced for the purpose of implementing an orderly liquidation. In a CCAA liquidation, some courts have applied the provisions of the Bankruptcy and Insolvency Act (R.S.C., 1985, c. B-3), which generally applies to smaller restructuring cases and does contain certain limitations on a landlord's claim. However, we are not aware of any case where a landlord's claim was limited in the context of a CCAA restructuring. *See* Supplemental Michaud Decl. at ¶ 20, n. 8. The Petitioner and the Debtors reserve all of their rights with respect to any claim(s) asserted by any of the Objectors, including the right to challenge such claim(s) on any grounds. Nothing herein should be construed as an admission to the existence or allowance of any claim that any party may have against the Debtors.

## <u>CONCLUSION</u>

For the reasons stated herein and in the Verified Petition, the Petitioner respectfully requests that this Court overrule the Objections and enter an order granting (i) recognition of the Canadian Proceedings in these Chapter 15 cases pursuant to section 1517 of the Bankruptcy Code and (ii) such other relief that the Court deems just and proper.

Dated: May 18, 2020
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Matthew B. McGuire (No. 4366)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  mcguire@lrclaw.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Howard Seife (admitted *pro hac vice*)
Andrew Rosenblatt (admitted *pro hac vice*)
Francisco Vazquez (admitted *pro hac vice*)
James A. Copeland (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email:  howard.seife@nortonrosefulbright.com
       andrew.rosenblatt@nortonrosefulbright.com
       francisco.vazquez@nortonrosefulbright.com
       james.copeland@nortonrosefulbright.com

*Counsel to the Petitioner*