## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:

SPECTRA PREMIUM INDUSTRIES INC., *et al.*,[1]

        Debtors in a Foreign Proceeding.

------------------------------------------------------------ x

Chapter 15

Case No. 20-10611 (BLS)

(Jointly Administered)

Hearing Date: October 12, 2021 at 10:00 a.m.
Objection Deadline: October 5, 2021 at 4:00 p.m.

**FOREIGN REPRESENTATIVE'S MOTION FOR AN ORDER (I) ENFORCING (A) CANADIAN COURT ORDER APPROVING SALE OF DEBTORS' ASSETS AND (B) CANADIAN COURT ORDER APPROVING ASSIGNMENT OF CERTAIN CONTRACTS, (II) APPROVING SALE OF DEBTORS' ASSETS, INCLUDING ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, AND (III) GRANTING RELATED RELIEF**

Ernst & Young Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Foreign Representative"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Spectra Premium Industries Inc. ("Spectra"), Spectra Premium Holdings (USA) Corp. ("Spectra Holdings US"), Spectra Premium (USA) Corp. ("Spectra US"), and Spectra Premium Properties (USA) Corp. ("Spectra Properties US," and, together with Spectra Holdings US and Spectra US, the "US Subsidiaries," and collectively with Spectra, the "Debtors"), in insolvency proceedings commenced under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") pending before the Superior Court, sitting in the Commercial Division

---

[1]    The Debtors in these Chapter 15 cases, along with the last four digits of each Debtor's federal identification number, are: Spectra Premium Industries Inc. (4016); Spectra Premium Holdings (USA) Corp. (7133); Spectra Premium (USA) Corp. (9447); and Spectra Premium Properties (USA) Corp. (7618). The registered office of Spectra Premium Industries Inc., the Debtors' ultimate corporate parent company, is located at 1 Place Ville Marie in Montréal, Québec, Canada, H3B 4M4, Suite 4000. The Debtors are collectively managed from the Spectra Group's corporate headquarters in Boucherville, Québec, Canada.

for the district of Montréal (the "Canadian Court"), File No. 500-11-058116-209 (the "Canadian Proceedings"), through its United States counsel, Landis Rath & Cobb LLP and Norton Rose Fulbright US LLP, respectfully submits this motion (the "Motion") seeking entry of an order, substantially in the form of the proposed order (the "Proposed Order") attached hereto as Exhibit A, (i) recognizing and giving full force and effect to the order that will be entered by the Canadian Court (the "Canadian Vesting Order") approving the sale of substantially all of the Debtors' assets to Turnspire Capital Partners ("Turnspire"), through its designees Spectra Premium Mobility Solutions Canada Ltd. and Spectra Premium Mobility Solutions USA, LLC (together, the "Purchaser"), (ii) recognizing and giving full force and effect to the order that will be entered by the Canadian Court approving the assignment of certain of the Debtors' contracts to the Purchaser (the "Canadian Assignment Order" and, together with the Canadian Vesting Order, the "Canadian Orders"), (iii) authorizing and approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests, including the assumption and assignment of certain contracts, to the Purchaser pursuant to the terms and conditions set forth in the Canadian Orders, and (iv) granting related relief.  In support thereof, the Foreign Representative respectfully states as follows:

## PRELIMINARY STATEMENT

The proposed sale of substantially all of the Debtors' assets in accordance with the Canadian Orders represents the culmination of the Canadian Proceedings and the extensive marketing and solicitation process conducted by the Debtors, in consultation with the Debtors' key stakeholders.  The Debtors actively marketed their business for sale for the past several months, and the proposed sale represents the highest and best offer for the Debtors' business. Specifically, the Debtors, with the assistance of the Foreign Representative, identified potential

strategic buyers, provided information and other due diligence to potential buyers, solicited offers for the sale of the Debtors' business, and ultimately negotiated what they believe is the best price for the sale of the business.  The Purchaser is a financially strong private equity firm with vast experience in acquiring and operating high-quality businesses, including a portfolio of companies in the automotive parts manufacturing sector.[2]

Importantly, the sale will allow the Debtors' business to continue as a going-concern, which will benefit not only the Debtors' current employees, but also the Debtors' customers and suppliers.  The sale is also fully supported by the Debtors' largest secured creditors, whose collateral is being sold and who has the largest economic stake in the outcome of these cases.

The Foreign Representative anticipates that the Canadian Court will approve the sale in accordance with the terms of the Canadian Orders, at a hearing to be held on or about September 28, 2021.  Subject to entry of the Canadian Orders, and for the reasons set forth herein, the Foreign Representative respectfully submits that the sale is in the best interest of the Debtors and their creditors, and the relief requested herein should be granted.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

---

[2]    Just last year, Turnspire acquired (i) Goodyear Air Springs, a leading provider of premium air springs for trucks, trailers, buses, and specialty vehicles, and a preferred partner to original equipment manufacturers and trucking fleets globally, and (ii) MPI Products, which is North America's leading Tier 1 supplier of high-precision, fineblanked metal components, and a leader in safety and mission-critical automotive and industrial parts.

Court for the District of Delaware (the "Local Rules"), the Foreign Representative consents to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.       Venue is proper before the Court pursuant to 28 U.S.C. § 1410.

4.       The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, 365, 554, 1507, 1520, and 1521.

**GENERAL BACKGROUND**

5.       On March 9, 2020, the Debtors and certain of their affiliates (the "Spectra Group") commenced insolvency proceedings in the Canadian Court under the CCAA.  On March 10, 2020, the Canadian Court entered an initial order (the "Initial Order") that, among other things, (a) appointed the Foreign Representative as Monitor of the Spectra Group and authorized it to commence these Chapter 15 Cases; (b) stayed the commencement or continuation of proceedings against the Debtors and their assets; and (c) authorized the Debtors to carry out certain restructuring activities.  Thereafter, the Canadian Court entered that certain amended and restated initial order (as amended, the "First Amended Initial Order") that, among other things, continued the relief granted to the Debtors and the Foreign Representative through the Initial Order.

6.       On March 11, 2020, the Foreign Representative filed with this Court the *Petitioner's Verified Petition Under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* [Docket No. 5] (the "Verified Petition")[3] seeking, among other

---

[3]    A detailed description of the Debtors, including their business operations, their corporate and capital structure, and the events leading to the commencement of the Canadian Proceedings and the Chapter 15 Cases, is set forth in greater detail in the Verified Petition and incorporated by reference herein.

things, recognition of the Canadian Proceedings for each of the Debtors as foreign main proceedings or, in the alternative, foreign nonmain proceedings under chapter 15 of the Bankruptcy Code.

7.      On May 29, 2020, this Court entered the *Final Order Granting Recognition of Foreign Main Proceedings and Certain Related Relief* [Docket No. 80] (the "Recognition Order") pursuant to which the Court recognized the Canadian Proceedings as foreign main proceedings and enforced the First Amended Initial Order, as such order may be amended from time to time, within the United States, including, without limitation, the stay of proceedings set forth therein.  *See* Recognition Order at ¶¶ 6 ("The Initial Order is hereby enforced on a final basis and given full force and effect in the United States, including, without limitation, the stay of proceedings to the extent set forth in the Initial Order.") and 10 ("Subject to sections 1520 and 1521 of the Bankruptcy Code, the Canadian Proceedings, and the Initial Order, and the transactions consummated or to be consummated thereunder, shall be granted comity and given full force and effect in the United States to the same extent as in Canada, and each is binding on all creditors of the Debtors and any of their successors and assigns.").

8.      Following entry of the Recognition Order, the Debtors and the Foreign Representative explored various restructuring options that would permit the Debtors to emerge from the Canadian Proceedings as a going-concern enterprise.  *See* Declaration of Éric St-Amour, dated September 21, 2021 (the "St-Amour Declaration") at ¶ 5.  However, during the course of the Canadian Proceedings the Debtors faced mounting and substantial negative market forces that have made it almost impossible for the Debtors to reorganize under its existing ownership structure. *Id.*

9.     Accordingly, beginning in early 2021, the Debtors, after engaging in discussions with various stakeholders, determined that the Debtors would launch in February 2021 a process (the "Go to Market Process") to identify and solicit potential partners and/or investors for the Debtors' post-restructuring operations.  *Id*. at ¶ 6.   Ultimately, the Debtors engaged Ernst & Young Orenda Corporate Finance Inc. ("EY OCF") to develop and oversee the Go to Market Process. *Id*.

10.     The Go to Market Process took several months and was aimed at reaching a wide array of both strategic and financial players within the industry to find a suitable equity partner with a strong level of interest in the Debtors' operations.  *See* St-Amour Declaration at ¶ 7. Between April and May 2021, the Debtors, with the assistance of its consultants and the Foreign Representative, who was involved in all steps of the Go to Market Process, solicited 104 different entities.  *Id*.  Of those 104 entities, 27 signed a non-disclosure agreement and received a confidential information memorandum and financial model. *Id*.

11.     Following a due diligence period, the Debtors received three non-binding expressions of interest ("EOIs").  *Id*. at ¶ 8.  All of the EOIs contemplated a transaction that would involve taking over the Debtors' business as a whole on a going concern basis.  *Id*.  After considering all of the EOIs and other potential restructuring alternatives, the Debtors' management determined that pursuing a sale of the Debtors as a going concern would be the best path forward to ensure the long-term viability of the Debtors' operations and business plan. *Id*.

12.     The Debtors' management met with those entities that submitted EOIs during the first week of June 2021, following which there was a "Q&A" period until June 18, 2021, which was the deadline for parties to submit non-binding Letters of Intent (each, an "LOI").  *Id*. at ¶ 9. On June 18, 2021, the Debtors received a bid by Turnspire that contemplated the acquisition of

substantially all of the Debtors' assets on a going-concern basis. *Id*. The bid submitted by Turnspire was the only bid received by the Debtors. *Id*. An LOI memorializing Turnspire's offer was signed on June 30, 2021. *Id*.

13. Thereafter, the Debtors, with the assistance of its consultants and with input from the Secured Lenders (defined below) and the Foreign Representative, negotiated the terms and conditions of an asset purchase agreement with Turnspire. *See* St-Amour Declaration at ¶ 10. In early September, the parties completed negotiations for a sale transaction that includes substantially all of the Debtors' assets (the "Purchased Assets"), including the Debtors' assets located in the United States (the "Sale").[4] *Id*. The terms of the proposed Sale are memorialized in an Asset Purchase Agreement entered into on September 17, 2021 by the Debtors and the Purchaser (the "Asset Purchase Agreement"). *Id*.

14. The Sale contemplated under the Asset Purchase Agreement is conditioned upon, among things, approval by the Canadian Court and this Court. *Id*. at ¶ 11. Specifically, the Asset Purchase Agreement requires that the Debtors obtain an order from the Canadian Court authorizing and approving the Debtors' entry into the Asset Purchase Agreement and approval of the Sale. *Id*. The Asset Purchase Agreement also requires the Debtors to obtain an order from the Canadian Court approving the Debtors' assignment of the contracts that are to be assigned to

---

[4] The assets to be acquired as part of the Sale that are located in the United States are designated under the Asset Purchase Agreement as "US Purchased Assets," which is defined as "all of the interest of US Opco in the Accounts Receivable, Inventory, the Assumed Contracts, the Fixed Assets, the Intellectual Property Rights, the leasehold interest of US Opco in the Premises (other than the Premises included in the Excluded Assets), the Rights of Action, the Equipment Leases, the Goodwill, the Records, Closing Cash (if the amount of the Closing Cash is positive), the Tax Credits and Wage Subsidies, the Prepaid Insurance Premiums, any claims and receivables owing from Spectra Sweden in excess of any outstanding indebtedness owing by the Sellers to Export Development Canada that is secured by such claims and receivables owing from Spectra Sweden, and all other assets of US Opco which US Opco has agreed to sell and the US Purchaser has agreed to purchase pursuant to this Agreement, and for greater certainty, excluding the Excluded Assets and the Canadian Purchased Assets." (all as such terms are defined in the Asset Purchase Agreement) *See* Asset Purchase Agreement at § 1.1.

the Purchaser as part of the Sale. *Id.* Finally, the Asset Purchase Agreement contains a closing condition requiring that the Debtors (through the Foreign Representative) obtain an order from this Court enforcing the Canadian Orders in the United States. *Id.*

15.    On September 20, 2021, the Debtors filed with the Canadian Court an application seeking (i) an order approving the Asset Purchase Agreement and the Debtors' entry into the sale transaction contemplated thereunder, and (ii) an order approving the Debtors' assumption and assignment of certain contracts (the "<u>Assigned Agreements</u>") to the Purchaser as part of the sale transaction (the "<u>Canadian Sale Application</u>"). *See* St-Amour Declaration at ¶ 12. A copy of the Canadian Sale Application is attached hereto at Exhibit B.[5] A hearing before the Canadian Court to consider approval of the Canadian Sale Application is currently scheduled for September 28, 2021. *Id.*

16.    The following chart summarizes the key terms of the Asset Purchase Agreement and the proposed Sale. The Foreign Representative believes that the terms of the proposed Sale are (i) fair and reasonable under the circumstances, (ii) the result of good faith, arm's-length negotiations between the Debtors and the Purchaser, and (iii) in the best interests of the Debtors, their creditors and other stakeholders, including the more than 700 employees, clients and suppliers of the Debtors. *Id.* at ¶ 13.

| MATERIAL TERMS OF PROPOSED SALE TRANSACTION | |
|---|---|
| **Purchaser** | Turnspire Capital Partners, through its designees Spectra Premium Mobility Solutions Canada Ltd. and Spectra Premium Mobility Solutions USA, LLC |

---

[5]    As is customary in Canada, the Asset Purchase Agreement attached to the Canadian Sale Application was filed under seal in the Canadian Proceedings. Consistent with the Canadian Proceedings, the Foreign Representative has filed a separate motion contemporaneously herewith seeking the Court's approval to file the Asset Purchase Agreement under seal in these Chapter 15 Cases.

| | |
|---|---|
| **Purchased Assets** | Substantially all of the assets of the Debtors, including the Debtors' assets located in the United States (except for Excluded Assets, as defined in the Asset Purchase Agreement). |
| **Contracts to be Assumed and Assigned** | A schedule setting forth the Assigned Agreements is attached to the Canadian Sale Application at Exhibit R-3 (the Canadian Sale Application is attached hereto at Exhibit B) |
| **Purchase Price** | As set forth in the Asset Purchase Agreement, which has been filed under seal. |
| **Closing Date** | Proposed Closing Date is October 29, 2021. |
| **Treatment of Main Secured Creditors** | Spectra Group's main secured creditors, Wells Fargo Capital Finance Corporation Canada, in its capacity as administrative agent for itself and Canadian Imperial Bank of Commerce (collectively: "Wells Fargo") and Laurentian Bank of Canada, in its capacity as administrative agent for itself and Export Development Canada (collectively: "LBC") are to be repaid in full upon Closing. |
| **Injection of Working Capital** | At Closing, Purchaser will inject significant amount of cash to finance working capital and future capital expenses of the new Spectra company. |
| **Relief from Bankruptcy Rules 6004(h) and 6006(d)** | As per the terms of the Asset Purchase Agreement, the parties anticipate a closing date of October 29,2021.  Accordingly, as set forth below in greater detail, the Foreign Representative seeks a waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |

17.    The Canadian Orders that the Foreign Representative seeks to have recognized and enforced by this Court have not yet entered.  *See* St-Amour Declaration at ¶ 14.  However, they are expected to be entered, following a hearing before the Canadian Court on or about September 28, 2021, in substantially the same form as the proposed orders that were submitted with the Canadian Sale Application.  *Id.*  Copies of the proposed Canadian Orders are attached to

the Canadian Sale Application at Exhibits R-1 and R-3, respectively (the Canadian Sale Application with copies of the proposed Canadian Orders is attached hereto at Exhibit B).[6]

## INTERESTS OF SECURED CREDITORS

18.    As described in the Verified Petition, substantially all of the Debtors' assets, including those located in the United States, are subject to blanket liens in favor of Wells Fargo and LBC (together, the "Secured Lenders"), the Debtors' largest secured creditors.  *See* St-Amour Declaration at ¶ 15.  The Secured Lenders have actively participated in the Canadian Proceedings and are supportive of the proposed Sale, including the relief sought by this Motion. *Id*.  Indeed, prior to filing the Canadian Sale Application, the Debtors and the Foreign Representative spent considerable time conferring with the Secured Lenders in order to obtain their input and consent with respect to the Sale. *Id*.

## RELIEF REQUESTED

19.    As set out above, the Sale is conditioned on recognition and enforcement of the Canadian Orders in the United States.  Certain of the Purchased Assets are located in the territorial jurisdiction of the United States and certain of the Assigned Agreements are governed by United States law and/or are with counterparties that are located in the United States. Accordingly, the Foreign Representative seeks recognition and enforcement of the Canadian Orders, as well as approval of the proposed Sale free and clear of all liens, claims, encumbrances, and other interests, and the assumption and assignment of the Assigned Agreements, pursuant to Sections 363, 365, 1520, 1521(a)(5) and 1521(a)(7) of the Bankruptcy Code.  Finally, pursuant to Section 1521(b) of the Bankruptcy Code, and consistent with the

---

[6]    Once entered, the Foreign Representative will file on the docket a supplement attaching the Canadian Orders as entered by the Canadian Court.

{1280.001-W0065930.}

terms of the Canadian Vesting Order and Asset Purchase Agreement, the Foreign Representative requests that the Court entrust the distribution of the proceeds of the Sale, except those that will be paid by the Purchaser directly to the Secured Lenders, to counsel for the Debtors.

## BASIS FOR RELIEF

### A.   The Court Should Recognize and Enforce the Canadian Orders

20.     The Foreign Representative seeks recognition and enforcement of the Canadian Orders to ensure that they are effective under the law of the United States, and to ensure that creditors and other parties-in-interest located in the United States comply with the orders.

21.     Section 1521 of the Bankruptcy Code sets forth various forms of relief that may be granted upon recognition of a foreign proceeding.  Section 1521(a)(5) provides that the Court may "entrust [] the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court."  Section 1521(a)(7) of the Bankruptcy Code further provides that the Court may "grant [] any additional relief that may be available to a trustee."

22.     As described above, prior to entering into the Asset Purchase Agreement, the Debtors, with the assistance of outside professionals (EY OCF), conducted a robust and comprehensive marketing and solicitation process aimed at identifying potential purchasers for the Debtors' business and providing a platform for the Debtors to negotiate the highest and best offer for the business.  *See* St-Amour Declaration at ¶¶ 6-10. Negotiations regarding the Sale were extensive and there was significant input and oversight from the Debtors' key stakeholders, including the Secured Lenders and Foreign Representative, ensuring that the sale process was

fair and that the Sale represents the best possible outcome for the Debtors' stakeholders.  *Id.* at ¶ 10.

23.    Moreover, the relief requested herein is predicated on the Canadian Court's approval of the Canadian Orders.  The Canadian Court is expected to approve those orders, but will only do so after scrutinizing the Sale and finding that the Sale is fair, reasonable, and in the best interest of all stakeholders.

24.    Generally speaking, bankruptcy courts in the United States are guided by principles of comity when deciding whether to enforce a foreign court order under section 1521 or section 1507[7] of the Bankruptcy Code.  The U.S. Supreme Court has described comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).

25.    Generally, United States courts will defer to proceedings taking place in foreign countries, allowing those proceedings to have extraterritorial effect in the United States unless the extension of comity "would be contrary or prejudicial to the interest" of the United States. *See Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 392-93 (3d Cir. 2006) (citations omitted); *see also  Aerotel, Ltd. v. IDT Corp.*, 486 F.Supp. 2d 277, 283 (S.D.N.Y. 2007)

---

[7]    The relief requested may also be granted pursuant to Bankruptcy Code section 1507.  Section 1507 authorizes this Court to "provide additional assistance to a foreign representative under [the Bankruptcy Code] or under other laws of the United States." 11 U.S.C. § 1507.  In deciding whether to extend relief under section 1507, this Court must consider principles of comity and determine whether the requested relief would reasonably assure: (a) just treatment of the Debtors' creditors and equity holders; (b) protection of the Debtors' US creditors against prejudice and inconvenience in claim processing; (c) prevention of preferential or fraudulent dispositions of the Debtors' property; and (d) distribution of the Debtors' property substantially in accordance with the Bankruptcy Code's priority scheme.  *See id.*  "These provisions embody the protections that were previously contained in section 304 of the Bankruptcy Code . . . ." *In re Rede Energia S.A.,* 515 B.R. 69, 95 (Bankr. S.D.N.Y. 2014).

(citations omitted) (in determining whether to grant comity to a foreign judgment, a court will generally examine: (i) whether the judgment was rendered via fraud; (ii) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (iii) whether the foreign judgment is repugnant to fundamental United States principles of what is decent and just).

26.    Here, there is little question that the Canadian Orders to be entered by the Canadian Court should be entitled to comity and enforced in the United States.[8] As noted above, in the Recognition Order this Court has already determined that "the Canadian Proceedings . . . and the transactions consummated or to be consummated thereunder, shall be granted comity and given full force and effect in the United States to the same extent as in Canada." *See supra*, ¶ 7.

27.    Moreover, enforcement of the Canadian Orders is crucial to protect the interests of the Debtors, their creditors and other stakeholders, including the Debtors' current employees and suppliers.  Recognition and enforcement of the Canadian Orders will permit the Debtors to proceed with the Sale in the Canadian Proceedings without disruption.  Absent enforcement of the Canadian Orders, the Debtors and all stakeholders will suffer irreparable harm, as recognition and enforcement of the orders in the United States is a condition precedent to the closing of the Sale.

28.    Finally, granting recognition to and enforcing the Canadian Orders in the United States would be consistent with the public policy embodied in Chapter 15 of the Bankruptcy Code, which is "to provide effective mechanisms" to promote cooperation in cross-border

---

[8]    Given the long history of Canadian proceedings being recognized and relief granted in such proceedings being enforced by U.S. courts, we are not aware of any facts or circumstances that would counsel against granting comity to the Canadian Orders, including the authorization therein in respect of the Sale. *See In re Davis,* 191 B.R. 577, 587 (Bankr. S.D.N.Y. 1996) ("Courts in the United States uniformly grant comity to Canadian proceedings.").

insolvency cases.   11 U.S.C. § 1501(a).   Accordingly, the Foreign Representative respectfully submits that this Court should recognize and give full force and effect under the laws of the United States to the Canadian Orders.

**B.**      **The Sale of Assets is Appropriate Under the Bankruptcy Code**

29.      The Recognition Order provides that "each of the Canadian Proceedings in respect of the [] Debtors is granted recognition as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code."   *See* Recognition Order at ¶ 5.   Section 1520(a)(2) of the Bankruptcy Code provides that, upon recognition of a foreign main proceeding, section 363 applies to a "transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that [it] would apply to property of an estate." 11 U.S.C. § 1520(a)(2); *see also In re Fairfield Sentry Ltd.*, 768 F.3d 239 (2d Cir. 2014) (applying section 363 review to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States); *In re Elpida Memory, Inc.*, Case No. 12-10947 (CSS), 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) (same).

30.      Section 1520(a)(3) of the Bankruptcy Code further provides that a "foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552.".   11 U.S.C. § 1520(a)(3).

31.      Finally, Section 1521 of the Bankruptcy Code provides, in relevant part, that "[u]pon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of [Chapter 15 of the Bankruptcy Code] and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including . . . granting any additional relief that may be available to a trustee."  11 U.S.C. § 1521(a)(7).

32.     Bankruptcy Code section 363(b)(1) provides that the Foreign Representative, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).  The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) and *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

33.     Once a court is satisfied that there is a sound business reason justifying the sale, the court must also determine that adequate and reasonable notice has been provided to interested parties, that the sale price is fair and reasonable, and that the purchaser is proceeding in good faith.  *In re Delaware & Hudson R.R. Co*., 124 B.R. at 176 (citation omitted).

34.     The Foreign Representative submits that ample business justifications exist to sell the Debtors' assets to the Purchaser.  As described above, the Debtors explored numerous restructuring options that would enable the Debtors to emerge from the Canadian Proceedings as a going-concern enterprise.  However, negative market forces, lack of sufficient liquidity and

funding, and other financial challenges have made it impossible for the Debtors to reorganize under its existing ownership structure.

35.    After significant input and consultation with key stakeholders, including the Foreign Representative, shareholders and the Secured Lenders, the Debtors determined that a sale of the Debtors' business on a going-concern basis would be in the best interests of the estates.  Given the Debtors' precarious financial situation, it is critical that that Sale close as soon as possible.[9]  In addition, the Debtors have actively marketed their business for several months. A sale of the entire business is the only actionable option available to the Debtors that will allow the business to continue to operate as a going concern without the need for outside funding, and that provides for the continued employment of substantially all of the Debtors' employees.

36.    Moreover, after the lengthy marketing and solicitation process described above, the Debtors and the Foreign Representative are confident that the proposed Sale with the Purchaser represents the highest and best offer for the Debtors' assets.  *See* St-Amour Declaration at ¶¶ 16-17.

37.    Relief similar to that requested in the Motion related to asset sales pursuant to Section 363 of the Bankruptcy Code has been granted in other Chapter 15 cases.  *See, e.g.*, *In re CDS U.S. Holdings, Inc.*, Case No. 20-11719 (CSS) (Bankr. D. Del. October 29, 2020) [Docket No. 112]; *In re PT Holdco, Inc.*, Case No. 16-10131 (LSS) (Bankr. D. Del. March 4, 2016) [Docket No. 47]; *In re Thane Int'l, Inc.*, Case No. 15-12186 (KG) (Bankr. D. Del. Dec. 1, 2015) [Docket No. 42]; *In re Xchange Technology Group LLC*, Case No. 13-12809 (KG) (Bankr. D.

---

[9]    Based on the hearing schedule in the Canadian Proceeding and the time periods required for the Canadian Orders to become final and non-appealable, the Sale is expected to close, and is required to close by the terms of the Asset Purchase Agreement, by no later than October 29, 2021.

Del. Nov. 25, 2013) [Docket No. 47]; *In re A.B.C. Learning Centres Limited n/k/a ZYX Learning Centres Limited*, Case No. 10-11711 (KG) (Bankr. D. Del. Sept. 24, 2013) [Docket No. 205].

38.    Finally, the interests of creditors and other parties are fully protected through the Canadian Proceedings and these Chapter 15 Cases.  Notice of the Canadian Sale Application was provided in the Canadian Proceedings, and parties had the right to object and be heard before the Canadian Court with respect to the proposed Sale.  *See Notice of Presentation* and *Service List* attached to the Canadian Sale Application.  Moreover, creditors continue to have recourse to the Canadian Court to seek any relief that may be necessary to protect their interests.  And, as described above, the Secured Lenders have consented to and fully support the Sale and the relief requested herein.  Accordingly, the interests of creditors and other parties in interest are adequately protected under the circumstances.  *See* 11 U.S.C. § 1522(a) ("The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected").

39.    For the foregoing reasons, the Foreign Representative respectfully submits that sufficient cause exists to authorize and approve the sale of the Debtors' assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement pursuant to Section 363 of the Bankruptcy Code.

**C.    The Court Should Approve the Sale of the Purchased Assets Free and Clear of Interests and Successor Liability Pursuant to Section 363(f) of the Bankruptcy Code**

40.    Under section 363(f) of the Bankruptcy Code, a trustee or a debtor in possession may sell all or any part of a debtor's property free and clear of any and all liens, claims, encumbrances, and other interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim or interest consents to

such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See* 11 U.S.C. § 363(f); *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90, 93–94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens. . . . Section 363(f) addresses sales free and clear of any interest . . . ."); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

41.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of any and all liens, claims, encumbrances, and other interests. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

42.     With respect to any creditors that may assert liens, claims, encumbrances, or other interests on the Purchased Assets, the Foreign Representative submits that at least one of the subsections of 363(f) of the Bankruptcy Code applies to such creditors and, in most cases, more than one of such subsections is satisfied.  Those holders of such liens, claims, encumbrances, or other interests who did not object, or who withdrew their objections, to the Motion and the sale of the Purchased Assets should be deemed, subject to the terms of the Proposed Order and the Canadian Orders, to have consented to such Sale free and clear pursuant to 11 U.S.C. § 363(f)(2).  Moreover, as described above, the Foreign Representative understands that the

Secured Lenders are supportive of the Sale and consent to the relief requested in the Motion. Accordingly, the Foreign Representative submits that the sale of the Purchased Assets free and clear of all interests, other than as provided in the Proposed Order and the Canadian Orders, satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

43.     Finally, it is well established that a bankruptcy court has the power under section 363(f) of the Bankruptcy Code to approve the sale of a debtor's assets free and clear of successor liability claims against the debtor.  *In re TWA Airlines, Inc*., 322 F.3d 283, 288–90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).  The Foreign Representative respectfully requests that this Court authorize the sale of the Purchased Assets to the Purchaser free and clear of claims based upon successor liability.  In this way, the Purchaser will obtain increased certainty concerning any claims associated with the Asset Purchase Agreement in the United States as it will be assured that it will not be considered a successor. The Foreign Representative submits that the relief requested herein is an appropriate exercise of this Court's authority under Chapter 15 of the Bankruptcy Code and does not conflict with the Canadian Orders.

**D.     <u>The Purchaser is Entitled to All Protections Available to a Good Faith Purchaser</u>**

44.     The Foreign Representative requests that the Court find that the Purchaser is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the Sale.  Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property

> in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code protects a good faith purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

45.     While the Bankruptcy Code does not define "good faith," courts generally consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143, 147 (3d. Cir. 1986).

46.     Here, neither the Purchaser nor any of the Purchaser's representatives or affiliates is an "insider" of the Debtors.  *See* St-Amour Declaration at ¶ 17.  The Foreign Representative is not aware of any fraud, collusion, or attempt to take unfair advantage of other bidders.  *Id*.  In addition, the terms of the Asset Purchase Agreement were negotiated at arm's length between the Purchaser and the Debtors (in consultation with the Foreign Representative and Secured Lenders) and there are no other terms of the Sale that are outside of the terms to be approved by the Canadian Court.  *Id*.  Based on the foregoing, the Foreign Representative submits that the Court should find that the Purchaser constitutes a good faith purchaser entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

**E.     The Assumption and Assignment of Contracts is Authorized Under the Bankruptcy Code and Is Warranted Under the Circumstances**

47.     Section 1521(a)(7) of the Bankruptcy Code provides that the court may grant a foreign representative "any appropriate relief," including "any relief that may be available to a trustee," where necessary to effectuate the purpose of Chapter 15 and to protect the assets of the debtor or the interests of creditors.  *See* 11 U.S.C. § 1521(a)(7).  Pursuant to this authority, the

Foreign Representative requests that the Court extend the protections afforded by Section 365 of the Bankruptcy Code to this Chapter 15 case.

48.     Section 365 of the Bankruptcy Code enables a debtor to assume contracts that are beneficial and valuable, but to reject those that are burdensome.  See *In re Fleming Companies, Inc.*, 499 F.3d 300, 304 (3d Cir. 2007) (stating that section 365 allows a trustee to "maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not").  Application of Section 365 in this Chapter 15 case is necessary to ensure that the Debtors can assume and assign the Assigned Agreements to the Purchaser as contemplated in the Asset Purchase Agreement and the Canadian Assignment Order.  Absent the application of Section 365 of the Bankruptcy Code, there is a risk that the counterparties to the Assigned Agreements may assert that they are not bound by the Canadian Assignment Order or may try to exercise contractual rights that may deprive the Purchaser of the benefits of performance under the Assigned Agreements.[10]

49.     It is well established that the decision to assume or reject an executory contract is subject to judicial review under the business judgement standard.  *See NLRB v. Bildisco*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp*., 872 F.2d 36, 39-40 (3d Cir. 1989).

50.     The assumption and assignment of the Assigned Agreements as part of the Sale is based on the Debtors' sound business judgment and is in the best interests of the Debtors and their creditors.  *See* St-Amour Declaration at ¶ 18.  The Debtors are selling substantially all of their assets.  Accordingly, the Debtors will have no use for the Assigned Agreements after the Sale closes.

---

[10]   The Foreign Representative's request for relief under Section 365 applies solely with respect to Assigned Agreements that are governed by United States law and/or for which the contract counterparty has its principal place of business in the United States.

Conversely, the Purchaser requires that it be assigned the Debtors' rights under the Assigned Agreements in order to continue the Debtors' business as a going concern. *See* Asset Purchase Agreement at § 2.2. Indeed, assignment of the Assigned Agreements is a condition precedent to the Closing of the Sale. *See id*. at § 4.1.4. If the Debtors are unable to assign the Assigned Agreements, the Sale will be jeopardized, causing a disruption in the administration of the Canadian Proceedings and a significant loss of value to the Debtors, their creditors and the Debtors' employees.

51.    The Foreign Representative believes that all requirements for assumption and assignment of the Assigned Agreements under Section 365(b)(1) of the Bankruptcy Code will be satisfied. First, with the exception of one of the Assigned Agreements,[11] it is expected that there will be no cure amounts owed by the Debtors to the counterparties of the Assigned Agreements as of the closing of the Sale.[12] *See* St-Amour Declaration at ¶ 20. Second, counterparties to the Assigned Agreements are adequately assured of future performance by the Purchaser, which has financial strength and industry experience necessary to capably manage the Debtors' business, including performing under the Assigned Agreements. *Id*. at ¶ 21.

52.    Relief related to the assumption and assignment of executory contracts pursuant to Section 365 of the Bankruptcy Code in connection with the sale of assets has been granted in several other Chapter 15 cases. *See In re Thane Int'l, Inc.*, Case No. 15-12186 (KG) (Bankr. D. Del. Dec. 1, 2015) [Docket No. 42]; *In re Xchange Technology Group LLC*, Case No. 13-12809 (KG)

---

[11]    As described in the Canadian Sale Application, the Purchaser has come to an agreement with Dream Industrial REIT, the counterparty to the only Assigned Agreement that would have required the payment of cure amounts, and pursuant to which the Purchaser undertakes to assume all of the Debtors' obligations under the Assigned Agreement, including the payment in equal installments until June 2025 of amounts that would have otherwise represented cure amounts payable at closing. *See* Canadian Sale Application (Exhibit B hereto) at ¶ 43.

[12]    Under Canadian law, similar to section 365 of the Bankruptcy Code, a debtor is required to cure defaults in order to assign a contract.

(Bankr. D. Del. Nov. 25, 2013) [Docket No. 47]; *In re Cinram International Inc.*, Case No. 12-11882 (KJC) (Bankr. D. Del. July 25, 2012) [Docket No. 98].

F.    **The Distribution of Sale Proceeds**

53.    The Canadian Vesting Order contemplates that, other than proceeds of the Sale that will be paid directly from the Purchaser to the Secured Lenders upon Closing, counsel for the Debtors will be entrusted with distributing the Sale proceeds in the manner set forth in the Canadian Vesting Order.  *See* Canadian Vesting Order at ¶ 17; *see also* Asset Purchase Agreement at § 2.4.  Out of an abundance of caution, the Foreign Representative is requesting that this Court confirm the authority of counsel for the Debtors (Lavery de Billy LLP)to be entrusted with the proceeds of the Sale in accordance with the Canadian Vesting Order.

54.    As noted above, Section 1521(b) of the Bankruptcy Code provides:

> Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

11 U.S.C. § 1521(b).  Pursuant to Section 1522 of the Bankruptcy Code, the Court may grant relief under section 1521 "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.  11 U.S.C. § 1522.

55.    Here, there is little question that the interests of creditors and the Debtors will be protected by entrusting the Sale proceeds (other than those paid directly to the Secured Lenders by the Purchaser) to counsel for the Debtors to be distributed in the manner set forth in the Canadian Vesting Order.  The Sale proceeds, after payment to the Secured Creditors, will be used to pay professional fees and transaction costs, which are secured by a court-ordered administration charge, and to satisfy in full certain liabilities owed to the Debtors' employees.

{1280.001-W0065930.}

Counsel for the Debtors will distribute such proceeds under the supervision of the Foreign Representative, acting in its capacity as Monitor in the Canadian Proceedings.  As such, entrusting the distribution of the Sale proceeds to counsel for the Debtors is just and promotes the primary objectives of cross-border insolvency cases; specifically (i) cooperation between the courts involved in cases of cross-border insolvency, and (ii) the fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and interested parties.

G.     **Waiver of Notice and Stay Under Bankruptcy Rules 6004 and 6006**

56.     To the extent that Bankruptcy Rule 6004(a) applies, the Foreign Representative respectfully requests a waiver of such notice requirement in order to successfully implement the foregoing requested relief.

57.     The Foreign Representative also requests that the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 6006(d).  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

58.     The relief that the Foreign Representative seeks in this Motion is time-sensitive and is necessary for the Debtors to implement the Sale in compliance with the timing requirements set forth in the Asset Purchase Agreement and approved by the Canadian Court. *See* St-Amour Declaration at ¶ 23.  Any delay in closing, could jeopardize the Sale to the detriment of the Debtors, their creditors and their employees.   Accordingly, the Foreign

Representative respectfully requests that the Court waive the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

59.     The Foreign Representative has provided notice of this Motion to the following parties or their respective counsel: (a) the office of the US Trustee for the District of Delaware; (b) Wells Fargo; (c) LBC; (d) EDC; (e) IQ; (f) each counterparty to an Assigned Agreement, including, without limitation, those that are located in the United States; (g) VFI Corporate Finance; (h) any parties in litigation against any of the Debtors that is pending in the United States; (i) the Purchaser; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Foreign Representative submits that no other or further notice of this Motion is necessary or required.

## NO PRIOR REQUEST

60.     Except as set forth herein, no previous request for the relief sought herein has been made by the Foreign Representative or the Debtors to this or any other court.

## CONCLUSION

**WHEREFORE**, the Foreign Representative respectfully requests that this Court grant the relief requested herein and such other and further relief as may be just and proper.

Dated: September 21, 2021          **LANDIS RATH & COBB LLP**
      Wilmington, Delaware

                                      */s/ Matthew B. McGuire*
                                      Matthew B. McGuire (No. 4366)
                                      919 Market Street, Suite 1800
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 467-4400
                                      Facsimile: (302) 467-4450
                                      Email:  mcguire@lrclaw.com

{1280.001-W0065930.}

-and-

**NORTON ROSE FULBRIGHT US LLP**
Andrew Rosenblatt (admitted *pro hac vice*)
Francisco Vazquez (admitted *pro hac vice*)
James A. Copeland (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email:  andrew.rosenblatt@nortonrosefulbright.com
   francisco.vazquez@nortonrosefulbright.com
   james.copeland@nortonrosefulbright.com

*Counsel to the Foreign Representative*