# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
In re:

SPECTRA PREMIUM INDUSTRIES INC., *et al.*,[1]

        Debtors in a Foreign Proceeding.

------------------------------------------------------------------ x

Chapter 15

Case No. 20-10611 (BLS)

(Jointly Administered)

## DECLARATION OF ÉRIC ST-AMOUR IN SUPPORT OF FOREIGN REPRESENTATIVE'S MOTION FOR AN ORDER (I) ENFORCING (A) CANADIAN COURT ORDER APPROVING SALE OF DEBTORS' ASSETS AND (B) CANADIAN COURT ORDER APPROVING ASSIGNMENT OF CERTAIN CONTRACTS, (II) APPROVING SALE OF DEBTORS' ASSETS, INCLUDING ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, AND (III) GRANTING RELATED RELIEF

I, Éric St-Amour, on behalf of Ernst & Young Inc. ("EY"), in its capacity as the court-appointed monitor and foreign representative of the Debtors, to the best of my information and belief, state as follows:

1. In my role as representative of the monitor, I have acquired to a certain extent a familiarity with the history, day-to-day operations, assets, financial condition, business affairs, and books and records of each of the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon my knowledge of the Debtors' operations and financial condition according to the information and documents provided to me by the Debtors and their advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

---

[1] The Debtors in these Chapter 15 cases, along with the last four digits of each Debtor's federal identification number, are: Spectra Premium Industries Inc. (4016); Spectra Premium Holdings (USA) Corp. (7133); Spectra Premium (USA) Corp. (9447); and Spectra Premium Properties (USA) Corp. (7618) (together, the "Debtors"). The registered office of Spectra Premium Industries Inc., the Debtors' ultimate parent company, is located at 1 Place Ville-Marie, Montreal, Quebec, Canada H3B 4M4, Suite 4000. The Debtors are collectively managed from the Spectra Group's corporate headquarters in Boucherville, Quebec, Canada.

CAN_DMS: \133293701\4

2. I am a Partner of EY, the court-appointed monitor in the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended ("CCAA") proceedings of the Debtors (the "Canadian Proceedings") and the Debtors' foreign representative (the "Foreign Representative") in these Chapter 15 cases. I have more than 15 years of experience in restructuring and advisory services, including providing financial, operational and strategic review analysis for companies in various industry sectors. In addition, I have participated in the planning and execution of several interim company management mandates, restructuring plans and proposals. I also provide advice to lenders and investors with troubled accounts or investments. I am based in EY's office located at 900 boul. de Maisonneuve Ouest, Bureau 2300, Montréal, Québec H3A 0A8, Canada.

3. I submit this declaration (the "St-Amour Declaration") in support of the *Foreign Representative's Motion for an Order (I) Enforcing (A) Canadian Court Order Approving Sale of Debtors' Assets and (B) Canadian Court Order Approving Assignment of Certain Contracts, (II) Approving Sale of Debtors' Assets, Including Assumption and Assignment of Certain Contracts, and (III) Granting Related Relief* that was filed contemporaneously herewith (the "Motion").[2] Specifically, Motion requests from this Court an order (i) recognizing and giving full force and effect to the order that will be entered by the Canadian Court (the "Canadian Vesting Order") approving the sale of substantially all of the Debtors' assets to Turnspire Capital Partners ("Turnspire"), through its designees Spectra Premium Mobility Solutions Canada Ltd. and Spectra Premium Mobility Solutions USA, LLC (together, the "Purchaser"), (ii) recognizing and giving full force and effect to the order that will be entered by the Canadian Court approving the assignment of certain of the Debtors' contracts to the Purchaser (the "Canadian Assignment Order" and, together with the Canadian Vesting Order, the "Canadian Orders"), and (iii) authorizing and

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

- 2 -

approving the sale of substantially all of the Debtors' assets, including the assumption and assignment of certain contracts, to the Purchaser pursuant to the terms and conditions set forth in the Canadian Orders.

**Marketing and Solicitation Process**

4. On May 29, 2020, this Court entered the *Final Order Granting Recognition of Foreign Main Proceedings and Certain Related Relief* [Docket No. 80] (the "Recognition Order") pursuant to which the Court recognized the Canadian Proceedings as foreign main proceedings.

5. Following entry of the Recognition Order, the Debtors and the Foreign Representative explored various restructuring options that would permit the Debtors to emerge from the Canadian Proceedings as a going-concern enterprise. However, during the course of the Canadian Proceedings the Debtors faced mounting and substantial negative market forces that have made it almost impossible for the Debtors to reorganize under its existing ownership structure.

6. Accordingly, beginning in early 2021, the Debtors, after engaging in discussions with various stakeholders, determined that the Debtors would launch in February 2021 a process (the "Go to Market Process") to identify and solicit potential partners and/or investors for the Debtors' post-restructuring operations. Ultimately, the Debtors engaged Ernst & Young Orenda Corporate Finance Inc. ("EY OCF") to develop and oversee the Go to Market Process. Although the Go to Market Process described below was spearheaded by the Debtors and their advisors and consultants, the Foreign Representative has been involved in every aspect of the process and has been consulted on key issues and decisions made with respect to the proposed sale transaction. Accordingly, I am familiar with the events that have led to the request for approval of the proposed sale transaction.

7. The Go to Market Process took several months and was aimed at reaching a wide array of both strategic and financial players within the industry to find a suitable equity partner with a strong level of interest in the Debtors' operations. Between April and May 2021, the Debtors, with the assistance of its consultants and the Foreign Representative, solicited 104 different entities. Of those 104 entities, 27 signed a non-disclosure agreement and received a confidential information memorandum and financial model.

8. Following a due diligence period, the Debtors received three non-binding expressions of interest ("EOIs"). All of the EOIs contemplated a transaction that would involve taking over the Debtors' business as a whole on a going concern basis. After considering all of the EOIs and other potential restructuring alternatives, the Debtors' management determined that pursuing a sale of the Debtors as a going concern would be the best path forward to ensure the long-term viability of the Debtors' operations and business plan.

9. The Debtors' management met with those entities that submitted EOIs during the first week of June 2021, following which there was a "Q&A" period until June 18, 2021, which was the deadline for parties to submit non-binding Letters of Intent (each, an "LOI"). On June 18, 2021, the Debtors received a bid by Turnspire that contemplated the acquisition of substantially all of the Debtors' assets on a going-concern basis. Turnspire's bid was the only bid received by the Debtors. An LOI memorializing Turnspire's offer was signed on June 30, 2021.

10. Thereafter, the Debtors, with the assistance of its consultants and with input from the Secured Lenders (defined below) and the Foreign Representative, negotiated the terms and conditions of an asset purchase agreement with Turnspire. In early September, the parties completed negotiations for a sale transaction that includes substantially all of the Debtors' assets, including the Debtors' assets located in the United States (the "Sale"). The terms of the proposed

Sale are memorialized in an Asset Purchase Agreement entered into on September 17, 2021 by the Debtors and the Purchaser (the "Asset Purchase Agreement").

11. The Sale contemplated under the Asset Purchase Agreement is conditioned upon, among things, approval by the Canadian Court and this Court. Specifically, the Asset Purchase Agreement requires that the Debtors obtain an order from the Canadian Court authorizing and approving the Debtors' entry into the Asset Purchase Agreement and approval of the Sale. The Asset Purchase Agreement also requires the Debtors to obtain an order from the Canadian Court approving the Debtors' assignment of the contracts that are to be assigned to the Purchaser as part of the Sale. Finally, the Asset Purchase Agreement contains a closing condition requiring that the Debtors (through the Foreign Representative) obtain an order from this Court enforcing the Canadian Orders in the United States.

12. On September 20, 2021, the Debtors filed with the Canadian Court an application seeking (i) an order approving the Asset Purchase Agreement and the Debtors' entry into the sale transaction contemplated thereunder, and (ii) an order approving the Debtors' assumption and assignment of certain contracts (the "Assigned Agreements") to the Purchaser as part of the sale transaction (the "Canadian Sale Application"). A hearing before the Canadian Court to consider approval of the Canadian Sale Application is currently scheduled for September 28, 2021.

13. The following chart summarizes the key terms of the Asset Purchase Agreement and the proposed Sale. The Foreign Representative believes that the terms of the proposed Sale are (i) fair and reasonable under the circumstances, (ii) the result of good faith, arm's-length negotiations between the Debtors and the Purchaser, and (iii) in the best interests of the Debtors, their creditors and other stakeholders, including the more than 700 employees, clients and suppliers of the Debtors.

| MATERIAL TERMS OF PROPOSED SALE TRANSACTION | |
|---|---|
| **Purchaser** | Turnspire Capital Partners, through its designees Spectra Premium Mobility Solutions Canada Ltd. and Spectra Premium Mobility Solutions USA, LLC |
| **Purchased Assets** | Substantially all of the assets of the Debtors, including the Debtors' assets located in the United States (except for Excluded Assets, as defined in the Asset Purchase Agreement). |
| **Contracts to be Assumed and Assigned** | A schedule setting forth the Assigned Agreements is attached to the Canadian Sale Application at Exhibit R-3 (the Canadian Sale Application is attached to the Motion at Exhibit B) |
| **Purchase Price** | As set forth in the Asset Purchase Agreement which has been filed under seal. |
| **Closing Date** | Proposed Closing Date is October 29, 2021. |
| **Treatment of Main Secured Creditors** | Spectra Group's main secured creditors, Wells Fargo Capital Finance Corporation Canada, in its capacity as administrative agent for itself and Canadian Imperial Bank of Commerce (collectively: "Wells Fargo") and Laurentian Bank of Canada, in its capacity as administrative agent for itself and Export Development Canada (collectively: "LBC") are to be repaid in full upon Closing. |
| **Injection of Working Capital** | At Closing, Purchaser will inject significant amount of cash to finance working capital and future capital expenses of the new Spectra company. |
| **Relief from Bankruptcy Rules 6004(h) and 6006(d)** | As per the terms of the Asset Purchase Agreement, the parties anticipate a closing date of October 29, 2021. Accordingly, the Foreign Representative seeks a waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |

14. The Canadian Orders have not yet entered. However, they are expected to be entered, following a hearing before the Canadian Court on or about September 28, 2021, in substantially the same form as the proposed orders that were submitted with the Canadian Sale Application.

15. As described in the Verified Petition, substantially all of the Debtors' assets, including those located in the United States, are subject to blanket liens in favor of Wells Fargo and LBC (together, the "Secured Lenders"), the Debtors' largest secured creditors. The Secured Lenders have actively participated in the Canadian Proceedings and are supportive of the proposed Sale, including the relief sought by this Motion. Prior to filing the Canadian Sale Application, the Debtors and the Foreign Representative spent considerable time conferring with the Secured Lenders in order to obtain their input and consent with respect to the Sale.

16. As noted above, I believe that the terms of the proposed Sale are fair and reasonable under the circumstances, are the result of good faith, arm's-length negotiations between the Debtors and the Purchaser, and represents the highest and best possible offer for the Debtors' assets.

17. Expounding further, I note that neither the Purchaser nor any of the Purchaser's representatives or affiliates is an "insider" of the Debtors. At no time during the Go to Market Process am I aware of any fraud, collusion, or attempt to take unfair advantage of any bidders by the Purchaser or the Debtors. In addition, I believe the terms of the Asset Purchase Agreement were negotiated at arm's length between the Purchaser and the Debtors (in consultation with the Foreign Representative and Secured Lenders) and there are no other terms of the Sale that are outside of the terms to be approved by the Canadian Court. I also believe the proposed purchase price is reasonable and fair, especially taking into account that the Go to Market Process resulted in only one biding offer, that being the one made by the Purchaser.

18. I also believe that assumption and assignment of the Assigned Agreements as part of the Sale is appropriate, is based on the Debtors' sound business judgment and is in the best interests of the Debtors, their creditors and other stakeholders.

19. My understanding is that, as per the terms of the Asset Purchase Agreement, the Purchaser has made it a condition of the Sale that the Assigned Agreements be assigned to it. I strongly believe that if the Debtors are unable to assign the Assigned Agreements to the Purchaser, then the Sale will be jeopardized, causing a disruption in the administration of the Canadian Proceedings and a significant loss of value to the Debtors, its creditors and the Debtors' employees.

20. With respect to assumption and assignment of the Assigned Agreements, it is my understanding that, with the exception of one of the Assigned Agreements,[3] there will be no monetary defaults to be cured at closing which did not arise by reason of the amounts owed by the Debtors to the counterparties of the Assigned Agreements as of the closing of the Sale.

21. I also believe that counterparties to the Assigned Agreements are adequately assured of future performance by the Purchaser based on its financial strength and industry experience. I am informed that the Purchaser (that being Turnspire) is a financially strong private equity firm with vast experience in acquiring and operating high-quality businesses, including a portfolio of companies in the automotive parts manufacturing sector. I am informed that just last year, Turnspire acquired (i) Goodyear Air Springs, a leading provider of premium air springs for trucks, trailers, buses, and specialty vehicles, and a preferred partner to original equipment manufacturers and trucking fleets globally, and (ii) MPI Products, which is North America's leading Tier 1 supplier of high-precision, fineblanked metal components, and a leader in safety and mission-critical automotive and industrial parts. Accordingly, I believe that the Purchaser has

---

[3] As described in the Canadian Sale Application, the Purchaser has come to an agreement with Dream Industrial REIT, the counterparty to the only Assigned Agreement that would have required the payment of cure amounts, and pursuant to which the Purchaser undertakes to assume all of the Debtors' obligations under the Assigned Agreement, including the payment in equal installments until June 2025 of amounts that would have otherwise represented cure amounts payable at closing. *See* Canadian Sale Application at ¶ 43.

the financial strength and industry experience necessary to capably manage the Debtors' business, including performing under the Assigned Agreements.

22. I note that the Foreign Representative has filed contemporaneously herewith, in addition to the Motion, a separate motion (the "Sealing Motion") seeking authority to file the Asset Purchase Agreement under seal. The Foreign Representative has filed the Sealing Motion in order to protect the integrity of the sale process in the Canadian Proceedings. In the Canadian Proceedings, the Asset Purchase Agreement has been filed under seal with the Canadian Court and is not made available for public viewing. This is common practice in sale transactions occurring during Canadian insolvency proceedings. This process, which is different than how bankruptcy asset sales are implemented in the U.S., is intended to maximize the sale price as of the date on which the bids must be submitted, as well as to maximize the sale price from subsequent bidders in the event that the current sale does not ultimately close.

23. Finally, I note that time is of the essence when it comes to the relief requested in the Motion. Importantly, under the Asset Purchase Agreement it is a requirement that the Closing occur on or before the Closing Date, which must occur no later than October 29, 2021. It is also a condition to closing that a final, non-appealable order be obtained from this Court approving the Sale. In order to satisfy this condition and meet the closing deadline, the Proposed Order approving the Sale needs to be entered as soon as possible.

## **Conclusion**

24. Based on my understanding of the facts and circumstances, the Foreign Representative believes that the proposed Sale is in the best interests of the Debtors, their creditors and other stakeholders, and requests that the Court grant the relief requested in the Motion.

[*Signature on following page*]

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed on this __21__ day of September, 2021.

Montréal, Quebec

_____
Éric St-Amour, on behalf of Ernst & Young Inc.
in its capacity as the monitor of
Spectra Premium Industries Inc. and its affiliated Debtors

[*Signature Page to St-Amour Declaration*]